**Wilfredy Rene VICIOSO, Appellant,**

v.

**The STATE of Texas, Appellee.**

No. 10–99–236–CR.

Court of Appeals of Texas,
Waco.

July 18, 2001.

Rehearing Overruled Aug. 22, 2001.

Andy J. McMullen, Hamilton, for appellant.

B.J. Shepherd, Hamilton County District Attorney, Martin L. Peterson, Hamilton County Asst. District Attorney, Meridian, for appellee.

Before Chief Justice DAVIS, Justice VANCE, and Justice GRAY.

## OPINION

VANCE, Justice.

A jury convicted Wilfredy Rene Vicioso of burglary of a habitation and sentenced him to life in prison after finding that the allegations of two previous felony convictions were true as alleged in the enhancement paragraph of the indictment. In four points of error, Vicioso claims that:

1. The trial court erred in overruling Vicioso's motion to suppress his written confession as a fruit of an illegal arrest, resulting in the violation of Vicioso's rights under both federal and state constitutions.

2. The trial court erred in overruling Vicioso's motion to suppress his written confession as a fruit of an illegal arrest, adversely affecting his substantial rights.

3. During the punishment phase, the trial court erred in overruling Vicioso's motion for mistrial and/or in failing to instruct the jury to disregard evidence of an unadjudicated extraneous crime.

4. The trial court erred in overruling Vicioso's objection to the court's charge on guilt/innocence for its failure to instruct the jury to disregard his confession as the fruit of an illegal arrest.

We will reverse the judgment.

## FACTS

Vicioso filed a motion to suppress a written confession he gave an officer of the Hamilton County Sheriff's Department ("Department"), claiming it was the "fruit" of an arrest made without probable cause.

At the suppression hearing, the State called one witness: Jim Buster of the Department. Buster testified that the Department was investigating several house burglaries in the county, including the "Diaz burglary," and that there were several suspects, including Vicioso and his girlfriend, Tammy Gomez. Both had prior convictions for burglary. Buster said that during the course of the investigation, the Department learned Gomez had pawned a stolen drill, and that investigators had interrogated Gomez and Vicioso about the drill. Apparently, neither was arrested. Later, the Department learned of a pawn ticket from Black's Pawn Shop in Granbury which might have been related to items stolen in the "Diaz burglary." The ticket, issued on the same day that the burglary occurred, was in Gomez's name. So, Buster testified, investigators began to again look for Gomez and Vicioso for questioning. We find it significant that had Buster felt at that point that probable cause existed to arrest Vicioso based on the information the Department had, he would undoubtedly have obtained an arrest warrant. That he did not demonstrates his belief that probable cause to arrest Vicioso was lacking.

■ Around 2:00 or 2:15 p.m., while Buster was getting a Diet Coke in Hico, he and Officer Howard Westmoreland saw Gomez and Vicioso go by in a van driven by Gomez, and they began to follow. Buster radioed ahead so that Officer Casey Heath could stop the vehicle. Buster said that at the scene of the stop, he took Gomez out of the vehicle and asked for permission to search it, which she gave. The search revealed nothing. The fact that Buster asked for permission to search the van shows he did not believe he had probable cause to arrest Gomez.[1] The of-

---

1. After an arrest, officers can search the passenger compartment of the vehicle as a

ficers questioned Gomez but obtained no incriminating information. Nevertheless, the officers handcuffed Vicioso and Gomez, placed them in separate squad cars, and took them to the Sheriff's Department where they were held separately. Vicioso was strip-searched and body-cavity searched by Heath and placed in a cell.

Buster said he "focus[ed] on Mrs. Gomez" by "giving her her rights" and interrogating her. Gomez confessed to Buster that she and Vicioso had been involved in at least three burglaries in Hamilton County. She also disclosed the location of a gun hidden in her vehicle, which was retrieved. About two hours after arriving at the Sheriff's Department, she signed a written confession. Buster testified that Gomez and some officers then visited the locations of the burglaries she described.

Buster said that after he took a written statement from Gomez, he went to the cell in which Vicioso was being held and told him that Gomez had confessed to the burglaries and that the gun had been recovered. He told Vicioso it was "up to him if he wanted to give a statement or not. We had the gun, had her statement implicating him in the burglary .... I told him if he didn't make a statement it didn't make me any difference because we could file felon with a gun on him and [we] had the burglary." [2] After a brief absence, Buster was called back by Vicioso who asked to speak to Gomez, which was allowed briefly, and then Buster "read him his rights." Buster said, "We didn't talk about the burglary until after he was Mirandized." Vicioso then gave a written statement confessing to burglaries; this was about three hours after arriving at the Department. At the hearing, Buster identified the written statement he took from Vicioso.[3]

On cross-examination, Buster said that no traffic citations were issued, although he said the vehicle had crossed the center line of the highway several times while the officers followed it. In response to a question about whether Vicioso and Gomez were at any time "free to go" after the initial stop, Buster testified:

A. We were—asked them to accompany us down there to—for questioning.

Q. So did you just say follow me down there?

A. No. No. We put them in the car and we transported them.

. . .

Q. Are you aware whether or not the Defendant was strip-searched upon arriving at the Sheriff's Department?

A. I believe he was, yes, sir.

Q. Then he was taken and put in a jail cell, was he not?

A. At some—at some point, yes, sir, he was.

Q. Okay. He was put in a jail cell while you were working with Tammy Gomez?

A. No, sir, not—not until after she had made a statement that he was involved in a burglary.

. . .

Q. Okay, so—so the basis for having— at that point he was arrested?

A. Yes. Based on her statement I felt I had probable cause to hold him in connection with the burglary.[4]

. . .

---

"search incident to arrest." *State v. Ballard,* 987 S.W.2d 889, 892 (Tex.Crim.App.1999).

**2.** As a convicted felon, Vicioso could not legally be in possession of a gun.

**3.** The statement was later admitted at trial with some redacting of information about unindicted offenses.

**4.** This again affirms that he did not believe that he had probable cause at an earlier time.

Q. All right. Did you have a warrant for his arrest?

A. Not at that time, no, sir. I based it on probable cause of her statement. I obtained a warrant as soon as I could the next morning on the 13th.

Buster verified that the vehicle belonged to Gomez, that he did not talk to Vicioso at the location of the initial detention, but concentrated on talking to Gomez, and that Vicioso was not taken before a magistrate before he gave the written statement.

On re-direct examination, the State asked Buster "what did you really know" about Vicioso when he and Gomez were stopped. Buster said he knew that there was the pawn ticket in Gomez's name, that Gomez and Vicioso lived together and she drove him wherever he went, and that Vicioso had a "criminal history out of Florida."

Vicioso called Westmoreland to testify. Westmoreland thought that the vehicle had been stopped by Officer Heath for a defective taillight. He said that he did not talk to Vicioso at the scene of the stop, so he did not know what Vicioso was told by the other officers. He said that all the officers drove by the Courthouse in Hamilton on the way to the Sheriff's Department, without stopping. The courthouse is where the Justice of the Peace and the County Judge (who usually act as the magistrates in Hamilton County) are located. He testified that although he did not remember reading Vicioso his *Miranda* rights, files from the Sheriff's office indicated he read Vicioso his rights about thirty minutes after arrival at the Department. (Vicioso denied this.) On cross-examination, he said that Vicioso and Gomez were being "detained" for questioning.

Vicioso also called Officer Heath, who testified that he stopped the vehicle because of a "defective brake signal." He said he took charge of Vicioso, handcuffed

him, and placed him in his patrol car. He said that Buster and Westmoreland told him to transport Vicioso to the Sheriff's Department "for a pending investigation." When asked if he would have removed the handcuffs if Vicioso had expressed a desire to get out of the patrol car, Heath said, "At that time, no, sir. . . . I had orders from a superior office to take him into the—put him into my patrol car." He said that Vicioso's hands were behind him and that he was seated in the front seat of the patrol car. They arrived at the Department about 2:30 in the afternoon. The strip-search occurred about ten minutes after they arrived at the Sheriff's Department. Vicioso was moved to a cell around 3:30.

Mike Metcalf, a jailer for the Hamilton County Sheriff's Department, testified that he arrived at the jail at 4:00 p.m. on the day Vicioso was arrested. He said that Vicioso had been there for about an hour, he was in a locked jail cell, his belt had been removed, and he had already been strip-searched.

Then Vicioso took the stand. He testified that Heath was flashing his lights even before turning around to follow the vehicle. He said the officers took Gomez out of the vehicle first, then removed him, handcuffed him, and placed him in Heath's vehicle. When Vicioso asked Heath whether he was under arrest, Heath said "I don't know." Vicioso said he was not asked whether he wanted to go to the Sheriff's Department and was given no choice about it. He said they drove past the Courthouse without stopping to see a magistrate, and that he was strip-searched five or ten minutes after arriving at the Sheriff's Department. He said Buster was "in and out" of the cell, and on one visit, told him that they had found the gun and that "I needed to go ahead and confess. If not, he was going to charge me with the

gun." He also said that Buster told him that if he confessed, Buster would "talk to the D.A., you know, that I complied and worked with him, the most I would get would be ten to fifteen." Vicioso denied ever being "Mirandized."

On cross-examination, Vicioso acknowledged that he had signed the written statement, but said that he would not have done so had he known he could remain silent and could have a lawyer appointed.

After a recess but before the motion was argued, the prosecutor told the court that Buster had informed counsel that his earlier testimony was incorrect as to the timing of the trip made by him and Gomez to the scene of the crimes she described. Counsel said that Buster told him that the trip occurred before Gomez gave her written statement, rather than afterwards.

The evidence at trial did not differ in any material aspects from the testimony at the suppression hearing.[5]

## THE LEGAL STANDARD

 We review a trial court's ruling on a motion to suppress under the standard set forth in *Guzman v. State*, 955 S.W.2d 85, 87 (Tex.Crim.App.1997). In *Guzman*, the Court of Criminal Appeals articulated the standard of review to be used when deciding mixed questions of law and fact such as "reasonable suspicion" and "probable cause" as follows:

[A]s a general rule, the appellate courts ... should afford almost total deference to a trial court's determination of the historical facts that the record supports especially when the trial court's fact findings are based on an evaluation of credibility and demeanor [citation omitted]. The appellate courts ... should

afford the same amount of deference to trial court rulings on "application of law to fact questions," also known as "mixed questions of law and fact," if the resolution of those ultimate questions turns on an evaluation of credibility and demeanor. The appellate courts may review de novo "mixed questions of law and fact" not falling within this category.

*Id.* at 88–89. When the facts are undisputed and we are presented with a pure question of law, *de novo* review is proper. *Oles v. State*, 965 S.W.2d 641, 643 (Tex.App.—Houston [1st Dist.] 1998), *aff'd*, 993 S.W.2d 103 (Tex.Crim.App.1999). Thus, when the issue to be determined on appeal is whether an officer had probable cause to seize a suspect, "the trial judge is not in an appreciably better position than the reviewing court to make that determination." *Guzman*, 955 S.W.2d at 87. Therefore, although due weight should be given to the inferences drawn by trial judges and law enforcement officers, determinations of reasonable suspicion and probable cause should be reviewed *de novo* on appeal. *Id.* (citing *Ornelas v. United States*, 517 U.S. 690, 699, 116 S.Ct. 1657, 1663, 134 L.Ed.2d 911 (1996)).

## LEGALITY OF THE ARREST

 Vicioso argues that his arrest was in violation of, among others, the Fourth Amendment to the United States Constitution and Chapter Fourteen of the Texas Code of Criminal Procedure. U.S. Const. amend. IV; Tex. Code Crim. Proc. Ann. arts. 14.01–14.06 (Vernon 1977 and Supp.2001). He says that he was "arrested" when officers handcuffed him during the road stop and then transported him to the Sheriff's Department. We agree. An "arrest" occurs "when a person's liberty of

---

5. We are not limited in our analysis to the evidence at the suppression hearing, but may also consider the trial evidence. *Barley v. State*, 906 S.W.2d 27, 31 n. 2 (Tex.Crim.App. 1995).

movement is successfully restricted or restrained, whether this is achieved by an officer's physical force or the suspect's submission to the officer's authority." *Medford v. State*, 13 S.W.3d 769, 773 (Tex. Crim.App.2000).[6] Furthermore, an arrest is complete only if "a reasonable person in the suspect's position would have understood the situation to constitute a restraint on freedom of movement of the degree which the law associates with formal arrest." *Id.* (citing *United States v. Corral–Franco*, 848 F.2d 536, 540 (5th Cir.1988)). The subjective intent of either the police officer or the defendant is irrelevant. *Medford*, 13 S.W.3d at 773–74.

■ Although the stop of Gomez's van may have been justified as a traffic stop, or perhaps even as an "investigatory stop" of both Vicioso and Gomez,[7] once the officers handcuffed Vicioso, placed him in a squad car, and drove him to the Department (much less strip-searched him and placed him in a cell), it cannot be disputed that he was under arrest. The question is: Was the arrest legal?

### Statutory Basis

■ It is undisputed that no warrant for Vicioso's arrest was obtained until the next day. Chapter Fourteen of the Code of Criminal Procedure details when an officer may make a warrantless arrest. TEX. CODE CRIM. PROC. ANN. arts. 14.01–14.06. Under these facts, none of the articles in Chapter Fourteen apply, nor does the

State so argue.[8] Therefore, the arrest, and the subsequent detention, were illegal. A "voluntary" confession given after an illegal arrest is tainted, and, as "a direct result of" the arrest, must be excluded under article 38.23(a) of the Code of Criminal Procedure. *Bell v. State*, 724 S.W.2d 780, 787 (Tex.Crim.App.1986) (citing *Wong Sun v. United States*, 371 U.S. 471, 485, 83 S.Ct. 407, 416, 9 L.Ed.2d 441 (1963)). Article 38.23(a) reads in part:

> No evidence obtained by an officer or other person in violation of any provisions of the Constitution or laws of the State of Texas, or of the Constitution or laws of the United States of America, shall be admitted in evidence against the accused on the trial of any criminal case.

TEX. CODE CRIM. PROC. ANN. art. 38.23(a) (Vernon Supp.2001). Therefore, Vicioso's statement should have been excluded at trial.

### Constitutional Basis

■ Aside from Chapter Fourteen and article 38.23, the Fourth Amendment requires probable cause before an arrest without a warrant can be made. U.S. CONST. amend. IV; *State v. Ballard*, 987 S.W.2d 889, 892 (Tex.Crim.App.1999). "Probable cause for an arrest exists where, at that moment, facts and circumstances within the knowledge of the arresting officer, and of which he has reasonably trustworthy information, would warrant a reasonably prudent person in believing that a particular person has committed or is com-

---

6. Article 15.22 of the Code of Criminal Procedure, "A person is arrested when he has been actually placed under restraint or taken into custody by an officer or person executing a warrant of arrest, or by an officer or person arresting without a warrant," is not a controlling legal definition of "arrest." *Medford*, 13 S.W.3d at 772.

7. Persons "reasonably suspected" of criminal activity can be briefly detained for question-

ing without probable cause or a warrant. *Terry v. Ohio*, 392 U.S. 1, 22, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889 (1968).

8. Gomez, who was driving, could have been arrested for a traffic violation, but she was not arrested or even ticketed for that. Therefore, under Chapter Fourteen, it appears there was no statutory authority to arrest Gomez.

mitting a crime." *Id.* There is no basis in these facts on which to find probable cause. Buster's testimony affirmatively shows that he knew he did not have probable cause at the time Vicioso was arrested. Therefore, the arrest was illegal, and the confession should have been excluded under the "exclusionary rule" as "a direct result of" the arrest. *Bell,* 724 S.W.2d at 787 (citing *Wong Sun,* 371 U.S. at 485, 83 S.Ct. at 416).

### Attenuation of the Taint

■ Because the statement is made inadmissible by the express wording of article 38.23, and also by the exclusionary rule, it might appear our analysis is finished. However, the Court of Criminal Appeals has held that when the complained of evidence is a confession given after an illegal arrest, the analysis must continue. *Dowthitt v. State,* 931 S.W.2d 244, 261 (Tex. Crim.App.1996); *Bell,* 724 S.W.2d at 788–89. We must also determine if the confession was given so freely and voluntarily that the causal connection between the arrest and the confession is broken, and therefore any taint from the illegal arrest is removed, thereby making the statement admissible. *Bell,* 724 S.W.2d at 788–89. To make this determination, we analyze the facts against four factors.

1. Were *Miranda* warnings given?
2. How much time elapsed between the arrest and the confession?
3. What intervening circumstances occurred between the arrest and the confession?
4. What was the purpose and flagrancy of the official misconduct?

*Bell,* 724 S.W.2d at 788 (citing *Brown v. Illinois,* 422 U.S. 590, 604–05, 95 S.Ct. 2254, 2261–62, 45 L.Ed.2d 416 (1975)).

■ Buster testified he "Mirandized" Vicioso just before taking his confession. Vicioso denied he was ever "Mirandized."

However, if this occurred it was only after Vicioso had been strip-searched and body-cavity searched, placed in a cell, told that Gomez had confessed and implicated him in burglaries, and threatened with indictment for a weapons charge. We do not find that this factor weighs in the State's favor.

About three hours elapsed between the arrest at the road-stop and when Vicioso gave the written statement. Considering the stress under which he was placed (strip-searched and body-cavity searched, placed in a cell, threatened by Buster), "an inference of a lack of time for reflection appears warranted." *Bell,* 724 S.W.2d at 789.

The intervening circumstances between the arrest and the statement clearly weigh in Vicioso's favor. To repeat, after he was arrested, he was taken to jail, strip-searched and body-cavity searched, placed in a cell, and threatened by Buster. These circumstances do not support an inference that Vicioso's statement was freely given.

Finally, the fourth factor, the purpose and flagrancy of the official misconduct, is one of the most important of the factors. *Id.; Renfro v. State,* 958 S.W.2d 880, 886–87 (Tex.App.—Texarkana 1997, pet. ref'd). In this case, there was no probable cause and no warrant. There may not even have been sufficient reason for an "investigatory detention" of Vicioso. This was a clear violation of the Fourth Amendment and of Chapter Fourteen. This factor weighs heavily in Vicioso's favor.

We conclude that the taint was not attenuated. *See Hadnot v. State,* 945 S.W.2d 278, 285–86 (Tex.App.—Beaumont 1997, no pet.) (taint not attenuated—the main purpose of the illegal arrest was investigatory).

## Conclusion

The arrest was illegal, and there was no attenuation of the taint. The statement, as a "fruit of the poisonous tree," should not have been admitted at trial.

## HARM ANALYSIS

Having concluded that admission of the statement was error, we must next determine if we should grant Vicioso a new trial. We must reverse for constitutional error unless we determine beyond a reasonable doubt that the error did not contribute to the conviction or punishment. TEX. R. APP. P. 44.2(a). The admission of the written statement was a constitutional error.

■ The application of the standard of reversing for constitutional errors was explained in *Harris v. State*, 790 S.W.2d 568 (Tex.Crim.App.1989). Citing *Fahy v. Connecticut*, 375 U.S. 85, 88, 84 S.Ct. 229, 231, 11 L.Ed.2d 171 (1963), the *Harris* court said: "We are not concerned here with whether there was sufficient evidence on which the petitioner could have been convicted without the evidence complained of. The question is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction. To decide this question, it is necessary to review the facts of the case and the evidence adduced at trial." *Harris*, 790 S.W.2d at 585. The goal is to examine all the evidence "solely to trace the impact of the error. The untainted evidence is not to be weighed in its own right, nor is it to be examined to see if it is cumulative with the tainted evidence." *Id.* Based on *Harris*, we do not review the evidence against Vicioso at trial, absent his own statement, to determine if the evidence was sufficient to support a conviction. That would place us in the shoes of the jury, substituting ourselves for the jury as factfinder. Rather, our inquiry is whether we can say beyond a reasonable doubt that the statement did not prejudice the jurors' decision-making process. *Id.* at 587.

*Harris* states six factors we should consider in reaching our conclusion: (1) the source of the error, (2) the nature of the error, (3) whether and to what extent the State emphasized the error, (4) the probable implications of the error, (5) how much weight a juror would probably place on the error, and (6) whether declaring the error harmless would encourage the State to repeat the error.

■ Other than his own written confession, the primary evidence against Vicioso at trial was Gomez. However, Gomez is an "accomplice witness." The Code of Criminal Procedure provides:

A conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense.

TEX. CODE CRIM. PROC. ANN., art. 38.14 (Vernon 1979). The trial court gave an accomplice-witness instruction in the jury charge based on this statute.

The source and nature of the error here was a blatant violation of Vicioso's Fourth Amendment rights by law enforcement officers. Declaring the error harmless would not encourage law enforcement to follow the Constitution as well as Chapter Fourteen in the future. Furthermore, the State certainly emphasized and relied on the confession throughout the trial. In addition, there is hardly ever more damaging evidence in a criminal trial than the defendant's admission of guilt. With the remaining evidence consisting primarily of the accusations of the accomplice witness, it is likely that the jury relied, at least in part, on the confession when reaching the

verdict. Based on this analysis, we cannot say beyond a reasonable doubt that the jury was not affected by Vicioso's statement. Therefore, we find the admission of the statement to be harmful error requiring reversal.

Because we find a harmful constitutional error, we do not reach the issue of whether the violation of Chapter Fourteen should result in reversal.[9]

## OTHER POINTS

Because we will reverse on the suppression point, we do not decide Vicioso's other complaints.

## CONCLUSION

Vicioso's statutory and constitutional rights were violated when he was illegally arrested The statement he gave was therefore inadmissible at trial. The court's error in overruling the suppression motion and admitting the statement at trial was harmful. We reverse the judgment and remand the cause for proceedings consistent with this opinion.

Justice GRAY dissenting.

GRAY, Justice, dissenting.

A jury convicted Wilfredy Rene Vicioso of burglary of a habitation and sentenced him to life in prison after finding that the allegations of two previous felony convictions were true as presented in the enhancement paragraph of the indictment. In four points of error, Vicioso claims that:

1. The trial court erred in overruling Vicioso's motion to suppress his written confession as a fruit of illegal arrest, resulting in the violation of Vicioso's rights under both federal and state constitutions.

2. The trial court erred in overruling Vicioso's motion to suppress his written confession as a fruit of illegal arrest, adversely affecting his substantial rights.

3. The trial court erred in overruling Vicioso's motion for mistrial and/or in failing to instruct the jury to disregard evidence of an unadjudicated extraneous crime during the punishment phase.

4. The trial court erred in overruling Vicioso's objection to the court's charge on guilt/innocence for its failure to instruct the jury to disregard his confession as the fruit of illegal arrest.

We should affirm the decision of the trial court. Because the majority does not, I respectfully dissent.

## FACTUAL BACKGROUND

The criminal investigation division of the Hamilton County Sheriff's Office was involved in an ongoing investigation of several house burglaries. Among the suspects were Vicioso and his girlfriend Tammy Gomez, both known to have been convicted of burglary and to have pawned stolen property. When Investigator Buster and his partner received a pawn ticket linking Gomez to a burglary at the Diaz residence, they began looking for the pair for questioning. Later that day, the van driven by Gomez was stopped by Hamilton County deputies. According to testimony, the deputies observed a traffic law violation. However, their primary reason for the stop was to afford Buster an opportunity to question Gomez. Vicioso was a passenger in the van at the time. A verbal warning was given for the traffic violation.

9. We will not reverse a non-constitutional error unless a substantial right of the accused has been affected. Tex. R. App. P. 44.2(b).

At the side of the road, Buster advised Gomez that they needed to talk about the pawn ticket for stolen property. Gomez gave permission for the van to be searched, but the officers found nothing related to the burglary. Gomez was arrested, advised of her rights, and transported to the Sheriff's Office. According to testimony, Vicioso was not advised of his rights, but was handcuffed and transported in a separate vehicle to the Sheriff's Office for a "pending investigation."

Upon arrival at the Sheriff's Office, Buster questioned Gomez. Gomez stated that she and Vicioso had been involved in several burglaries in Hamilton County and described the residences burglarized and some of the property taken, as well as what had been done with the property. She also told the officers where to find a gun that was hidden in the van. About two and a half hours after arriving at the Sheriff's Office, Gomez signed her written statement implicating Vicioso in several burglaries.

While the officers concentrated on Gomez and her story, Vicioso waited-first in the interrogation room and then in a holding cell. Shortly after arriving at the Sheriff's Office, Vicioso was strip searched in the interrogation room. The officer did not find any contraband during the body cavity search. Although he did not remember giving Vicioso his rights, Buster's partner testified that the Sheriff's files indicated that he had warned Vicioso in accordance with *Miranda* about thirty minutes after Vicioso arrived. While Buster accompanied Gomez to a burglary location, Vicioso was moved to a holding cell.

After obtaining Gomez's statement, Buster spoke with Vicioso in his cell, informing him that the handgun had been located[1] and that Gomez had told him about the burglaries. Buster gave Vicioso the option of making a statement, then left Vicioso in the cell. A short time later, Buster was called back to the cell because Vicioso wanted to talk. Vicioso first spoke privately with Gomez, then announced that he was ready to give a statement. Buster warned Vicioso in accordance with *Miranda* before he gave his statement and then again after completion of the confession (about four hours after arriving at the Sheriff's Office). Vicioso was arraigned before a magistrate the next morning.

Vicioso admitted to several burglaries in his statement, including burglary of the Mills residence in Carlton, the Diaz residence west of Hamilton on Highway 36, and the Burdett residence east of Hamilton on Highway 36. Because Vicioso was indicted only for burglary of the Mills residence, the court instructed the State to present a redacted copy of the confession as evidence during the guilt-innocence phase of the trial. At the punishment phase, the State introduced another redacted copy of the statement that reflected his admission to all three burglaries. The jury never saw the entire written confession.

## MOTION TO SUPPRESS

In his first two points of error, Vicioso contends that the trial court erred in overruling his motion to suppress his written statement. Specifically, he claims that his confession should be suppressed because (1) it is the product of an illegal arrest; (2) the failure to take him before a magistrate tainted his statement; and (3) his statement was not voluntarily given.

### Standard of Review

The *Guzman* court established the standard that we use to review the denial of a

---

1. As a convicted felon, Vicioso could not legally be in possession of a handgun.

motion to suppress. *See Guzman v. State,* 955 S.W.2d 85 (Tex.Crim.App.1997). In that opinion, the Court of Criminal Appeals stated:

[A]s a general rule, the appellate courts ... should afford almost total deference to a trial court's determination of the historical facts that the record supports especially when the trial court's fact findings are based on an evaluation of credibility and demeanor. The appellate courts ... should afford the same amount of deference to trial courts' rulings on 'application of law to fact questions,' also known as 'mixed questions of law and fact,' if the resolution of those ultimate questions turns on an evaluation of credibility and demeanor. The appellate courts may review *de novo* 'mixed questions of law and fact' not falling within this category. [citations omitted].

*Id.* at 89. When the facts are undisputed and we are presented with a pure question of law, *de novo* review is proper. *Oles v. State,* 965 S.W.2d 641, 643 (Tex.App.—Houston [1st Dist.] 1998), *aff'd,* 993 S.W.2d 103 (Tex.1999).

### (1) Illegal arrest

It is unclear when Vicioso was actually arrested. According to the trial court's findings of fact, Vicioso was under arrest at the time of his written confession. The officer who transported Vicioso to the Sheriff's Office and performed the strip search testified that Vicioso was merely detained until he was moved to the holding cell; at that point, Vicioso was "arrested." Buster testified that Vicioso was not ar-rested until Gomez had completed her statement about an hour and a half later. The record does not indicate an exact arrest time; the State's brief, however, refers to "the arrest at 2:30 p.m."-the time that Vicioso was handcuffed at the side of the road. Vicioso's pre-trial testimony indicates that he felt that he was not free to leave at the time of the traffic stop. Because it would not affect the ultimate disposition of the issue, I will assume that the custodial detention that began at the side of the road at 2:30 p.m. amounted to an arrest.

The parties do not seem to dispute the other historical facts regarding the arrest.[2] In his brief, Vicioso is questioning the application of law to the facts. Therefore, it is proper that a *de novo* review based on an arrest time of 2:30 p.m. is conducted.

Vicioso argues that his statement was the fruit of an illegal warrantless arrest. According to Vicioso, his written confession was obtained in violation of the federal constitution, the state constitution, and the Texas Code of Criminal Procedure. The State claims that the arrest was legal, but adds that any possible taint associated with Vicioso's arrest was subsequently purged.

There is no dispute that Vicioso was arrested without a warrant. In Texas, a warrantless arrest is illegal unless it falls under one of the statutory exceptions to the warrant requirement. *See Self v. State,* 709 S.W.2d 662, 665 (Tex.Crim.App. 1986). The only statutory exception that is potentially applicable here is article 14.04 of the Texas Code of Criminal Proce-

2. Vicioso testified at the pre-trial hearing that his rights were not read to him. According to his testimony, he was told to sign or initial documents without having them explained. However, in his brief, Vicioso refers to Buster's testimony that he gave Vicioso his rights, but makes no comment. He makes no refer-ence to Buster's partner's testimony that he had *Mirandized* Vicioso shortly after his arrival at the Sheriff's Office. The brief only complains that the officer who transported Vicioso to the Sheriff's Office never read the *Miranda* warning nor heard anyone else do so. The State does not contest that.

dure, which provides that an officer may arrest a suspect upon the representation of a credible person that a felony has been committed and that the offender is about to escape, leaving no time to obtain a warrant. TEX. CODE CRIM. PROC. ANN. art. 14.04 (Vernon 2000). There is no evidence that Vicioso was about to escape. Without further analysis, I will assume that Vicioso's arrest was illegal.

All evidence obtained as the direct result of an illegal arrest must be excluded under the Fourth Amendment to the United States Constitution and article 38.23 of the Texas Code of Criminal Procedure. Simply because evidence is obtained subsequent to an illegal arrest, however, does not automatically render it inadmissible. *Bell v. State,* 724 S.W.2d 780, 787 (Tex. Crim.App.1986). Subsequent statements are admissible if the confession was "the product of the defendant's free will sufficient to purge the primary taint of the illegal arrest." *Roeder v. State,* 768 S.W.2d 745, 752 (Tex.App.—Houston [1st Dist.] 1988, pet. ref'd). The factors generally considered in assessing whether the taint of an unlawful arrest has been sufficiently attenuated to allow admission of the evidence are:

1. Whether *Miranda* warnings were given;
2. The temporal proximity of the arrest and the evidence;
3. The presence of intervening circumstances; and
4. The purpose and flagrancy of the official misconduct.

*Brown v. Illinois,* 422 U.S. 590, 603–04, 95 S.Ct. 2254, 2261–62, 45 L.Ed.2d 416 (1975).

With regard to the first factor, the record shows that Vicioso was given *Miranda* warnings at least once before he gave his statement. Vicioso signed the ·Statement of Rights and initialed the warnings printed at the top of his voluntary statement. Although *Miranda* warnings alone are not enough to purge the taint of an illegal arrest, they are considered a threshold requirement. *Townsley v. State,* 652 S.W.2d 791, 796 (Tex.Crim.App.1983). Thus, the first factor weighs in favor of admitting the statement.

The second factor generally carries little weight as a determinative factor when taken alone. Not surprisingly, courts cannot agree on what constitutes a sufficient number of hours to establish that a statement is unrelated to an illegal arrest. *See Bell v. State,* 724 S.W.2d 780, 788 n. 4 (Tex. Crim.App.1986). The *Bell* court does, however, consider whether the defendant had a chance to reflect before giving his statement. *Id.* at 789, 791. About three hours passed between Vicioso's arrival at the Sheriff's Office and his statement. Although this is a relatively short amount of time, Vicioso spent much of that time alone in the interrogation room and then in a holding cell. While no one knows what went through his mind during that time, Vicioso did have an opportunity to reflect upon his situation. This factor too tends to favor admitting the statement.

With regard to the third factor, it must be determined if there were intervening circumstances that might have broken the causal link between the arrest and the confession. *Black v. State,* 762 S.W.2d 192, 193 (Tex.App.—Houston [1st Dist.] 1988, pet. ref'd). The State claims that any unreasonableness of the detention was removed once Vicioso's accomplice implicated him in the crimes. The State refers us to the *Townsley* case, in which evidence establishing probable cause was obtained after the defendant was illegally arrested.[3]

---

3. On the strength of the precedential nature

of this case alone. I would argue that the

The evidence was obtained by examining the body of the deceased and by interviewing neighbors. The Court of Criminal Appeals held that the causal chain was broken because the evidence was independent of the illegal arrest and furnished probable cause for the arrest of the defendant. *See Townsley v. State,* 652 S.W.2d 791 (Tex. Crim.App.1983). Here, evidence implicating Vicioso was obtained from his accomplice. Although both Vicioso and Gomez were brought into the Sheriff's Office at the same time, the record shows that only Gomez was initially questioned about the burglaries. Gomez provided evidence incriminating Vicioso. Thus, the evidence establishing probable cause against Vicioso was not a product of his illegal arrest. As in *Townsley,* Vicioso confessed to the crimes after probable cause had been obtained from other sources. "Under these circumstances, it would be unrealistic *not* to conclude that significant intervening events broke any causal connection between appellant's brief illegal detention... and his subsequent confessions." *Id.* at 797–98 (emphasis in original).

There is another incident that could also be considered an intervening circumstance. The record shows that Inspector Buster was called back to Vicioso's cell because Vicioso wanted to talk. Courts have commonly accepted that a volunteered statement not made in response to police interrogation is sufficient to purge the taint of an illegal arrest. *Bell v. State,* 724 S.W.2d 780, 789 n. 5 (Tex.Crim.App.1986). Both incidents tend to favor admission of the statement.

The fourth factor, the purpose and flagrancy of police conduct, is more problematic with regard to this case. We have already defined flagrantly abusive police conduct as: "reliance on factors in making

an arrest which were so lacking in indicia of probable cause as to render belief in its existence entirely unreasonable; an arrest effectuated as a pretext for collateral objectives; or an arrest which is unnecessarily intrusive on personal privacy." *Holmes v. State,* 962 S.W.2d 663, 669 (Tex.App.— Waco 1998, pet. ref'd, untimely filed).

Although there is conflicting testimony from law enforcement officers, it appears that the vehicle carrying Gomez and Vicioso was stopped for the collateral purpose of questioning the driver about a burglary. The Supreme Court has held, however, that police officers may stop and briefly detain persons reasonably suspected of criminal activity even if probable cause to arrest is not then present. *Terry v. Ohio,* 392 U.S. 1, 22, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889 (1968). The officers had physical evidence, the pawn ticket, linking the driver of the vehicle to a crime. The Court of Criminal Appeals has held that passengers in an automobile are also subject to temporary investigative detentions. *Gearing v. State,* 685 S.W.2d 326, 328 (Tex. Crim.App.1985) (op. on reh'g). Law enforcement officers were aware of Vicioso's past criminal record and his association with a suspect in the Diaz burglary, Gomez. On the other hand, the strip and body cavity search was intrusive on Vicioso's personal privacy, although testimony indicated that possession of a firearm was suspected. As noted, a firearm was later found hidden in the van.

In *Brown,* a leading example of flagrant police conduct, the defendant was virtually ambushed at gunpoint by three plainsclothes officers as he returned home one evening. The *Brown* court held that the arrest had the "appearance of having been calculated to cause surprise, fright, and

majority has failed to correctly apply the law to the facts of this case. The detention in

*Townsley* was well in excess of the detention in this case.

confusion." *Brown v. Illinois*, 422 U.S. 590, 606, 95 S.Ct. 2254, 2262. The *Irby* court adopted this standard, finding an illegal arrest was not flagrant because it did not "overawe appellant or deprive him of free will." *Irby v. State*, 711 S.W.2d 337, 339 (Tex.App.—Dallas 1986, pet. ref'd). Although Vicioso testified that he was confused at the time of the traffic stop, there is no evidence that law enforcement officers planned to frighten Vicioso into confessing or that Vicioso was deprived of his free will. Buster testified that Vicioso did not appear excessively frightened or in fear; Vicioso was upset that Gomez gave a statement, however. Vicioso was a suspect and was detained while another suspect was being questioned about the burglaries. He was allowed time to reflect on his situation and subsequently initiated the actual making of his statement. This was not a flagrant act by law enforcement to coerce a confession. Although I do not condone the manner of the arrest and subsequent search, the actions of law enforcement do not shock the conscience. Based on all the circumstances, this factor is neutral because the purpose was well-intentioned and not unreasonable, but the strip and body cavity search in the absence of probable cause and without a warrant was a flagrant violation of Vicioso's rights.

In summary, after considering all four factors, I conclude that the State met its burden to show that the taint, if any, of the illegal arrest was overcome. Therefore, I conclude that the statement should not have been suppressed.

*(2) Magistrate*

Vicioso further contends that his statement was tainted by the failure to take him before a magistrate in a timely manner. At the pre-trial hearing, Vicioso testified that if he had been taken before the magistrate, he would not have made the statement. Because resolution of this issue turns on an evaluation of Vicioso's credibility and demeanor, we afford almost total deference to the trial court's determination of the historical facts. *See Guzman*, 955 S.W.2d at 89.

Article 14.06 of the Texas Code of Criminal Procedure provides that upon being arrested, a suspect shall be taken before a magistrate "without unnecessary delay" so that the magistrate can advise him of his *Miranda* rights. Tex. Code Crim. Proc. Ann. art. 14.06(a) (Vernon Supp.2000). The failure to take an arrestee before a magistrate in a timely manner will not invalidate a confession unless the arrestee can show the causal connection between the confession and the delay. *Cantu v. State*, 842 S.W.2d 667, 679 (Tex.Crim.App. 1992). An unreasonable delay will not vitiate an otherwise voluntary confession if the arrestee was properly advised of his *Miranda* rights. *Id.*

Here, the record shows that Vicioso was taken before a magistrate the morning after his arrest and written statement. Buster testified at the pre-trial hearing that he advised Vicioso of his rights. As evidence, the State produced the Statement of Rights signed by Vicioso prior to giving his statement. On the other hand, Vicioso testified that his rights were never explained to him and that he did not recall signing the Statement of Rights on the day of his arrest. At the pre-trial hearing, the judge had the opportunity to question Vicioso about his understanding of his rights. The determination of whether the confession would not have been given by Vicioso if he had been taken immediately to a magistrate and given his *Miranda* warning required the trial court to resolve disputed facts and decide issues of credibility. Accordingly, I would defer to the trial court's determination that the statement should

not have been suppressed because of the delay in taking Vicioso before a magistrate.

### (3) Voluntariness

Vicioso argues that his statement should have been suppressed because it was not given voluntarily. Specifically, he argues that the statement was involuntarily given simply because it was a product of unlawful arrest. Again, we afford almost total deference to the trial judge's determination of the historical facts. *See Guzman,* 955 S.W.2d at 89. After reviewing the record, I find that the State met its burden of showing that Vicioso's statement was freely and voluntarily given. Although Vicioso testified that there were threats that he would be charged with possession of a firearm and promises of a fifteen-year sentence if he cooperated, the trial judge is the sole judge of the weight to give the evidence and credibility of the witnesses. The trial court was free to believe Vicioso's version of how the confession was obtained, but did not.

Thus, I would hold that the trial court did not err by denying Vicioso's motion to suppress because (1) the connection between the illegal arrest and the statement was so attenuated as to dissipate the taint; (2) the delay in taking Vicioso before a magistrate did not taint his statement; and (3) the statement was freely and voluntarily made by Vicioso without compulsion or persuasion. I would overrule points of error one and two.

### PUNISHMENT PHASE

In his third point of error, Vicioso contends that the trial court erred in overruling his motion for mistrial and in failing to instruct the jury to disregard evidence of the Burdett burglary during the punishment phase of the trial. The State introduced evidence of Vicioso's involvement in this unadjudicated burglary for the jury's consideration in assessing the appropriate punishment for Vicioso as an habitual criminal. *See* TEX. CODE CRIM. PROC. ANN. art 37.07 § 3(a). Vicioso moved for mistrial at the conclusion of the State's evidence, claiming that the State had not proved beyond a reasonable doubt that Vicioso had committed the burglary. The trial court denied the motion for mistrial. Vicioso also objected to the charge of the court at the punishment phase, requesting that the jury be instructed not to consider evidence of the Burdett burglary at all in deliberations regarding punishment. The court overruled the objection, but it did instruct the jury to disregard the evidence unless it found that Vicioso committed the offense beyond a reasonable doubt. "Reasonable doubt" was defined in the charge of the court.

### Extraneous Offense

Evidence as to any matter may be offered during the punishment phase if the court deems it relevant to sentencing, including but not limited to

> the prior criminal record of the defendant, his general reputation, his character, an opinion regarding his character, the circumstances of the offense for which he is being tried, and, notwithstanding Rules 404 and 405, Texas Rules of Criminal Evidence, any other evidence of extraneous crime or bad act that is shown beyond a reasonable doubt by evidence to have been committed by the defendant or for which he could be held criminally responsible, regardless of whether he has previously been charged with or finally convicted of the crime or act.

TEX. CODE CRIM. PROC. ANN. art. 37.07 § 3(a). A trial court's actions as to the admissibility of an extraneous offense is reviewed under an abuse of discretion standard. *Saenz v. State,* 843 S.W.2d 24,

26 (Tex.Crim.App.1992). Whether the evidence establishes the extraneous bad act beyond a reasonable doubt, however, is a question of fact for the jury and not a preliminary question of admissibility for the trial court. *Mitchell v. State,* 931 S.W.2d 950, 953 (Tex.Crim.App.1996).

Here, the State introduced evidence of an unadjudicated extraneous offense for consideration by the jury in the punishment phase. The court properly instructed the jury that before considering other offenses in determining Vicioso's punishment, it must find beyond a reasonable doubt that he committed those offenses. Therefore, Vicioso's claim that the State did not prove that he committed the Burdett burglary beyond a reasonable doubt fails. The jury as the finder of fact could only consider the extraneous offense if it first determined that the State's burden of proof had been met.

**Mistrial**

A trial court's denial of a motion for mistrial is reviewed under an abuse of discretion standard. *State v. Gonzalez,* 855 S.W.2d 692, 696 (Tex.Crim.App.1993). A mistrial is a device used to halt trial proceedings in extreme cases when error is so prejudicial as to appear calculated to inflame the minds of the jury members. *Moore v. State,* 882 S.W.2d 844, 847 (Tex. Crim.App.1994). The determination of whether a mistrial is required must be based on the particular facts of each individual case. Courts have commonly accepted that harm can be cured by a jury instruction to disregard the evidence if there is error instead of declaring a mistrial. *Hernandez v. State,* 805 S.W.2d 409, 413–14 (Tex.Crim.App.1990).

Here, we discern no abuse of discretion in the trial court's denial of a mistrial. Art. 37.07 § 3(a) allows introduction of extraneous crimes or bad acts proven beyond a reasonable doubt during the punishment phase, and the trial court did instruct the jury to disregard evidence of the Burdett burglary if the State did not prove beyond a reasonable doubt that Vicioso committed the act. The trial court could have reasonably concluded that the evidence was not so inflammatory as (1) to prevent the jury from rationally evaluating whether the State had proved Vicioso's involvement in the Burdett burglary beyond a reasonable doubt, or (2) to prevent the jury from properly disregarding the alleged extraneous offense in determining punishment if the State failed to meet its burden of proof.

For these reasons, I would overrule Vicioso's third point of error.

## JURY CHARGE: GUILT/INNOCENCE PHASE

Finally, Vicioso claims that the court erred in failing to include an instruction to the jury that any statement that is obtained from the accused while held pursuant to an illegal arrest is not admissible. This is simply a misstatement of the law by Vicioso. As discussed, subsequent statements are admissible if the confession was "the product of the defendant's free will sufficient to purge the primary taint of the illegal arrest." *Roeder v. State,* 768 S.W.2d 745, 752 (Tex.App.—Houston [1st Dist.] 1988, pet. ref'd). The inaccurate instruction requested by Vicioso was properly rejected by the trial court; therefore, I would overrule Vicioso's fourth point of error.

## CONCLUSION

Having overruled Vicioso's four issues, I would affirm the trial court's judgment. Because the majority does not, I respectfully dissent.